Carl D. Crowell, OSB No. 982049
email:  crowell@kite.com
CROWELL LAW
P.O. Box 923
Salem, OR 97308
(503) 581-1240
Of attorneys for plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| SLEP-TONE ENTERTAINMENT CORPORATION | Case No.:  6:13-cv-00560 |
| Plaintiff, | COMPLAINT |
| | TRADEMARK INFRINGEMENT |
| v. | UNFAIR COMPETITION 15 U.S.C. 1125 |
| | UNFAIR TRADE PRACTICES ORS 646.608 |
| DUFFY'S IRISH PUB and BCK CORPORATION | COMMON LAW PASSING OFF |
| Defendants. | JURY TRIAL REQUESTED |

Slep-Tone Entertainment Corporation ("Slep-Tone") filed an initial complaint against the defendants in this matter (and others) in Civil Action No. 6:13-cv-00051-TC.  In that matter the parties entered into an agreement by which the defendants would be severed and this new complaint might be filed against defendants relating back to the filing of the original complaint. The parties' agreement was submitted and became an order of the court as per Document 37, of the 6:13-cv-00051-TC action.

Wherefore pursuant to the agreement of the parties and the order of the court, Slep-Tone, complains and alleges as follows:

COMPLAINT                                                                                                    1

## **INTRODUCTION**

1.      Slep-Tone is the manufacturer and distributor of karaoke accompaniment tracks sold

under the name "Sound Choice®."  Slep-Tone was founded over 25 years ago by Kurt and Derek

Slep, two brothers with a vision to nurture the development of karaoke in America as a

participatory entertainment phenomenon.  During that time, Sound Choice® came to be

recognized as one of the leading producers of high-quality karaoke accompaniment tracks.  The

company invested over $18 million to license, re-record and replicate the authentic sound of

popular music across different eras and genres of music.

2.      The Slep brothers' dedication to producing music of the highest quality and the most

authentic character led its music to become the staple of almost every karaoke show in the

country.  As karaoke grew in popularity, Sound Choice® became the brand that nearly every

karaoke fan wanted to sing and that nearly every karaoke jockey ("KJ") wanted in his or her

library.

3.      KJs play karaoke songs using compact discs containing files written in one of two special

encoded formats, either "CD+G" ("compact disc plus graphics") or "MP3G" ("MP3 plus

graphics"), in which the disc contains the music and the lyrics, which will display on a screen.  A

principal value of a KJ's service to patrons is the catalog (number and quality of songs) they are

able to present or make available to customers.

4.      In recent years, computer technology, cheap file memory devices, and the internet have

made it possible for karaoke discs to be decoded and copied or "ripped" to a user's hard drive

and easily copied and distributed between KJs.  This technology has proven irresistible to KJs,

many of whom have used this opportunity to copy a single purchased disc to several different

computer based systems, copy a singer's personal discs if they use them during a show, "swap" song files among each other, download them from illegal file-sharing sites and build libraries of tens of thousands of karaoke songs without paying for them.  Whereas in the past a KJ would buy multiple copies of an original disc if he or she desired to operate multiple systems, now they simply "clone" their songs for multiple commercial systems or even their entire karaoke song libraries to start a new operation.  Additionally, many KJs or operators simply buy computer hard drives or systems pre-loaded with thousands of illegally copied songs.

5.      These practices have become so widespread that Slep-Tone has been driven nearly out of business.  At its peak, the Sound Choice® family of companies employed over 75 individuals and produced as many as 5 new karaoke discs per month.

6.      Today, the enterprise employs fewer than 7 individuals.  Sound Choice Studios, which was responsible for production of new material, ceased making new recordings in 2009 as every new disc produced was quickly illegally copied and distributed among KJs.  The most recent new disc sold only a handful of copies and did not produce enough revenue to even cover the production and licensing costs associated with it – yet the songs from that disc can be found on thousands of commercial karaoke systems around the United States.

7.      For KJs and affiliated establishments, karaoke is a commercial enterprise.  Karaoke is often a central element of a bar or venue to bring in customers and keep customers entertained and purchasing drinks or food for profit.  The costs for a venue to host a KJ who legitimately acquired all of their music at great cost is far greater than the costs for a venue to host a KJ that has acquired their library through illegal copying or other unauthorized methods.

8.      Illegitimate competitors offer customers libraries of tens of thousands of songs, which would have cost $50,000 to $100,000 or more to acquire legally, and are able to undercut

COMPLAINT                                                                                      3

legitimate KJ services which must purchase legal songs.  The result is significant financial pressure on once-legitimate establishments to skirt or ignore the law and become pirates, simply to stay in business and stay competitive.

9.      Slep-Tone has been forced to undertake this litigation in order to ensure that it survives and is able to produce the high-quality karaoke music its fans demand and to level the playing field for the legitimate establishments that wish to offer legal karaoke services.


## JURISDICTION AND VENUE

10.      This is an action for trademark infringement and unfair competition arising under §§ 32 and 43 of the Trademark Act of 1946, 15 U.S.C. §§ 1114 and 1125.

11.      This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States.

12.      This court further has jurisdiction pursuant to 28 U.S.C § 1338(a), in that this civil action arises under an Act of Congress relating to trademarks, and, as to the plaintiff's Lanham Act unfair competition claim, pursuant to 28 U.S.C. § 1338(b), in that the claim is joined with a substantial and related claim under the trademark laws of the United States.

13.      This court has supplemental jurisdiction over the subject matter of the plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a), in that those claims are so related to the plaintiff's federal claims that they form part of the same case or controversy.

14.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because all of the defendants reside in this State, and at least one of the defendants resides in this judicial district.

///

///


COMPLAINT                                                                                                 4

## PARTIES

### THE PLAINTIFF

15.     Plaintiff Slep-Tone is a North Carolina corporation having its principal place of business at 14100 South Lakes Drive, Charlotte, North Carolina, doing business nationwide.

### THE RIGHTS OF THE PLAINTIFF

16.     Slep-Tone is the owner of U.S. Trademark Registration No. 1,923,448 and No. 4,099,045 for the trademark SOUND CHOICE.

17.     Slep-Tone is the owner of U.S. Trademark Registration No. 2,000,725 and No. 4,099,052, for a display trademark as follows:



18.     Slep-Tone is the owner of the registered trademark SOUND CHOICE, registered with the State of Oregon, Reg. No. 42,675, pursuant to ORS §§ 647.005, et seq.

19.     Slep-Tone has, for the entire time its marks ("the Sound Choice marks") have been federally registered, provided the public, including the defendants, with notice of its federal registrations through the consistent display of the symbol ® with its marks as used.

20.     Slep-Tone is the owner of distinctive and protectable trade dress associated with its graphical displays ("the trade dress").  This distinctive and protectable trade dress includes, at a minimum:

        a.   the use of a particular typeface, style, and visual arrangement in displaying the lyrics;

b.  the use of particular colors to display lyrics, namely white lyrics changing to violet lyrics, set against a black background; and

c.  the use of a particular style in displaying entry cues for singers, namely a series of vanishing rectangles to indicate the cue.

21.  The trade dress has been in use continuously and substantially exclusively by Slep-Tone since the onset of production on compact discs more than 20 years ago.

22.  The individual and collected elements of the trade dress have acquired secondary meaning as an indicator of Slep-Tone as a source, effectively functioning as a visual trademark.

23.  The trade dress serves to distinguish Slep-Tone's tracks from the tracks of its competitors, such that persons who are even minimally frequent consumers of karaoke entertainment services such as those provided by these defendants are capable of identifying a particular karaoke track as originating with Slep-Tone simply by examining the trade dress, whether or not the Sound Choice marks are also displayed.

24.  The elements of the trade dress represent specific design choices by Slep-Tone; they are but one of many ways to convey the information necessary to permit a karaoke singer to be cued or appropriately supported in his or her performance.

25.  Slep-Tone's many competitors are not required to use any element of the trade dress to accomplish the cueing function, and indeed all of Slep-Tone's known competitors are known to use other trade dress in accomplishing the cueing function.

**THE DEFENDANTS**

26.  Defendant DUFFY'S IRISH PUB is a restaurant and bar located in Lebanon, Oregon that provides karaoke entertainment.

27.    Defendant BCK Corporation is an Oregon domestic business corporation with its principal place of business in Lebanon, Oregon that operates DUFFY'S IRISH PUB.

### FACTS COMMON TO ALL CLAIMS

28.    The term "karaoke" means "empty orchestra" in Japanese.  Karaoke entertainment has grown into a multi-million dollar business in the United States.

29.    Karaoke compact disc plus graphics or MP3 plus graphics recordings contain re-created arrangements of popular songs for use as "accompaniment tracks."

30.    Typically, the lead vocal tracks in an accompaniment track are omitted so that a karaoke participant can sing along, as though he or she were the lead singer.  In other situations, the lead vocal track by a sound-alike artist might be included, and some formats allow the lead vocal to be selectively muted upon playback so that the accompaniment track may be listened to either with or without the lead vocals.

31.    The "graphics" portion of a karaoke recording refers to the encoding of the recording with data to provide a contemporaneous video display of the lyrics to the song, in order to aid the performer.

32.    This graphics data is also utilized to mark the accompaniment tracks with the Sound Choice trademarks and to cause the Sound Choice trademarks to be displayed upon playback.

33.    This graphics data also causes the plaintiff's distinctive trade dress comprising the non-functional elements of changing-color lyrics, singing cues, the particular typeface and layout of the lyrics, and logos and other graphical elements, to be displayed.

34.    Slep-Tone also marks its compact discs and their associated packaging with the Sound Choice trademarks.

COMPLAINT                                                                                                      7

35.     Karaoke is an entertainment service and entertainment source often offered by bars and other venues to entice customers to enter and remain so that they will purchase drinks or other goods and services allowing the bar or venue to profit.

36.     Those who provide the actual karaoke services in bars, restaurants, and other venues are known as karaoke jockeys ("KJs"), karaoke hosts, or karaoke operators.

37.     Karaoke entertainment services typically include providing a KJ for entertaining the assembled crowd for warm-up purposes and organizing the karaoke show by controlling access to the stage, setting the order of performance, and operating the karaoke equipment.

38.     Bars and other venues will sometimes have an employee act as KJ and manage the karaoke, or they may elect to allow a third party to provide karaoke services.

39.     Karaoke entertainment services also typically include providing karaoke music or software such as the plaintiff's product and equipment for storing the software and playback.

40.     Typically a karaoke entertainment service will maintain a printed catalog of songs available for performance in order to aid participants in selecting a song to sing.

41.     Legitimate karaoke entertainment services purchase equipment and purchase or license compact discs containing accompaniment tracks and charge for the above-mentioned karaoke services.

42.     Some karaoke entertainment services copy the accompaniment tracks from compact discs to computer hard drives or other media, an activity known as "media-shifting."  In many cases, media-shifting also involves converting the compact disc files to a different format, such as from CD+G format to MP3G format or WAV+G format; this is referred to as "format-shifting."  Both media-shifting and format-shifting involve the creation of duplicates of the original materials stored on the compact discs.

COMPLAINT                                                                                      8

43.    Whether the bar or other venue directly provides the karaoke service or allows a third party to provide the service, the net benefit to the bar or venue is the same, namely they profit by having the entertainment provided to their customers, attracting more customers who stay longer and increasing sales.

44.    Upon information and belief, and based upon investigation of their activities within the last year, the defendants are in possession of or regularly utilize unauthorized media-shifted and format-shifted duplicates of karaoke accompaniment tracks which have been falsely marked with Slep-Tone's federally registered trademarks, or which carry Slep-Tone's distinctive trade dress, or both.

45.    Slep-Tone authorizes media-shifting and format-shifting with respect to those elements which it does own or control, and otherwise tolerates media-shifting and format-shifting (together, a status Slep-Tone refers to as "tolerance of media-shifting in a one-to-one correspondence"), only under very specific conditions.

46.    Slep-Tone's conditions for tolerance of media-shifting (and format shifting) include:

    a.    that each media-shifted or format shifted track must have originated from an original, authentic compact disc;

    b.    that the tracks from the original, authentic compact disc be shifted to one, and only one alternative medium at a time;

    c.    that the karaoke entertainment service provider maintain ownership and possession of the original, authentic compact disc for the entire time that the media-shifted or format-shifted tracks are in existence;

    d.    that the original, authentic compact disc not be used for any commercial purpose while its content has been shifted; and

e.   that the karaoke entertainment service provider notify Slep-Tone that he or she intends to conduct or has conducted a media-shift or format-shift, and submits to a verification of adherence to Slep-Tone's policy.

47.   Media-shifting or format-shifting that occurs outside the conditions of tolerance described above is entirely without authorization or tolerance.  Specifically, if the karaoke entertainment service does not maintain the strict 1:1 correspondence of all media-shifted songs matching to an original Slep-Tone disc in their possession at all times, then the authorization to shift any of the other tracks, even if there are some media shifted tracks and original discs that are in 1:1 correspondence, is denied.

48.   Defendants have used or benefited from media-shifted and/or format-shifted karaoke accompaniment tracks marked with the plaintiff's registered trademarks and/or distinctive trade dress for commercial purposes – to wit, to provide karaoke entertainment services to or for the benefit of their customers.

49.   Without exception, the defendants' media-shifting activities have been undertaken outside the conditions of tolerance described above.

50.   A karaoke accompaniment track that exists outside the conditions of tolerance described above and that has been marked with Slep-Tone's federally registered trademarks or distinctive trade dress is a counterfeit.

51.   Neither Slep-Tone nor any of its associated companies has ever authorized the digitization of its songs for commercial use in producing karaoke shows at defendants' location.

52.   Slep-Tone and its affiliated companies have spent millions of dollars building and maintaining studios, hiring artists, building a distribution facility, paying royalties to copyright owners, building a company that is capable of reliably producing high-quality karaoke versions

COMPLAINT                                                                                                        10

of current and historical musical hits, and building a brand that is one of the pre-eminent brands in the industry.

53.    Slep-Tone and its affiliated companies pay statutory and negotiated royalties to the owners of copyright in the underlying musical works for their activities in legitimately creating, copying, distributing, and selling compact discs containing karaoke accompaniment tracks.

54.    The copying, sharing, distribution, and selling of media-shifted tracks is not accompanied by the payment of any royalty to Slep-Tone, nor authorized by any license agreement.

55.    Those persons, including the defendants, who use, profit from, illegitimately obtain, copy, share, distribute, and/or sell media-shifted copies of the plaintiff's accompaniment tracks do not pay royalties to the owners of copyright in the underlying musical works.

56.    The widespread creation and use of counterfeit copies of Slep-Tone's karaoke discs and software has denied Slep-Tone the benefit of its investments.

57.    These counterfeits include Slep-Tone's registered trademarks, such that to the consumers of the illegitimate karaoke entertainment services, the counterfeits are virtually indistinguishable from the karaoke entertainment service providers who utilize genuine and licensed Sound Choice materials.

58.    For each of the several recent releases of new karaoke music by Slep-Tone, on average dozens of illegitimate copies of the contents of the disc have been created for each legitimate copy sold.  Slep-Tone, its affiliated companies, and its licensors have lost a considerable amount of money due to this widespread piracy.

59.    Such widespread illegal copying of music has been made possible by improving and ever cheaper computer technology and memory devices and the easy distribution of digital content over the internet.

COMPLAINT                                                                                                    11

60.    Widespread pirating of songs has contributed to the loss of more than sixty-five jobs at the plaintiff's location in Charlotte, North Carolina, as well as several consecutive years of operating losses, as revenues do not cover fixed costs.

61.    Legitimate karaoke entertainment service providers spend thousands of dollars acquiring Slep-Tone's accompaniment tracks, an irreducible overhead cost that must be recovered over a significant number of engagements.

62.    Illegitimate karaoke entertainment service providers who acquire the songs in their libraries illegally, have an unfair advantage over legitimate karaoke entertainment service providers because the illegitimate karaoke entertainment service providers are able to provide karaoke services with a considerably lower overhead cost and significantly more songs through the pirating of Slep-Tone's tracks.

63.    Piracy therefore unfairly increases the profits of illegitimate karaoke entertainment service providers and unfairly decreases the profits of legitimate karaoke entertainment service providers, a condition that pressures legitimate karaoke entertainment service providers to either commit piracy instead of doing business with Slep-Tone and other karaoke music producers or lose their shows or their patrons to illegitimate karaoke entertainment service providers offering more songs at cheaper prices to the same venues.

64.    Because of piracy, it is nearly impossible for legitimate karaoke entertainment service providers to compete against illegal karaoke entertainment service providers, who are able to provide less expensive karaoke services and a greater number of tracks due to their lower overhead costs.

COMPLAINT                                                                                                      12

65.     Even when pirate KJs have been forced through legal action or agreement to destroy their counterfeit duplicates of the plaintiff's tracks, the pirate KJs continue to engage in unfair competition using pirated materials belonging to other manufacturers.

66.     This unfair competition harms the plaintiff, despite the elimination of counterfeit duplicates of the plaintiff's tracks, because the continuing piracy of other manufacturers' tracks exerts continuing pressure upon the plaintiff's customers and potential customers to commit piracy of the plaintiff's tracks.

67.     It is specifically alleged that defendants DUFFY'S IRISH PUB and BCK CORPORATION have possessed, used, or authorized or benefited from the use and display of unauthorized counterfeit goods bearing the Sound Choice marks, the trade dress, or both, without authorization or tolerance from - or indeed notice to - the plaintiff, or has provided, advertised, or authorized or benefited from the provision of services in connection with the Sound Choice marks, the trade dress, or both.

68.     It is specifically alleged that defendants DUFFY'S IRISH PUB and BCK CORPORATION or their providers of karaoke entertainment services have provided services in connection with the Sound Choice marks, the trade dress, or both, without authorization or tolerance from – or indeed notice to – the plaintiff, and have advertised their provision of or availability to provide karaoke services in connection with which the Sound Choice marks, the trade dress, or both have been used.

69.     The activities of defendants DUFFY'S IRISH PUB and BCK CORPORATION are not isolated or sporadic occurrences, but are instead regular activities undertaken over a long period of time, in some cases months or years, depending upon when the activity was commenced.

COMPLAINT                                                                                     13

70.     Defendants DUFFY'S IRISH PUB and BCK CORPORATION or their provider's of karaoke entertainment services acts of infringement are of a commercial nature, in that they engaged in the acts with the transfer of money or other things of value from one party to another as the principal motivation for providing the services.

71.     Defendants DUFFY'S IRISH PUB and BCK CORPORATION or their providers of karaoke entertainment services employs a library of karaoke music that contains unauthorized counterfeit goods bearing the Sound Choice marks, the trade dress, or both, and specifically including media-shifted karaoke tracks.

72.     Neither DUFFY'S IRISH PUB, BCK CORPORATION nor their providers of karaoke entertainment services have obtained the permission of Slep-Tone to conduct media-shifting of Slep-Tone's music from original discs to an alternative medium, such as a computer hard drive.

73.     Neither DUFFY'S IRISH PUB, BCK CORPORATION nor their providers of karaoke entertainment services have notified Slep-Tone of their intent to conduct media-shifting of Slep-Tone's music for commercial purposes.

74.     Neither DUFFY'S IRISH PUB, BCK CORPORATION nor their providers of karaoke entertainment services have submitted to and passed an audit of their karaoke systems for the purposes of verifying their compliance with Slep-Tone's media-shifting policy.

75.     The piracy of accompaniment tracks by defendants DUFFY'S IRISH PUB and BCK CORPORATION or their providers of karaoke entertainment services is not limited to Slep-Tone's tracks.

76.     Defendants DUFFY'S IRISH PUB and BCK CORPORATION or their providers of karaoke entertainment services committed acts of piracy of other manufacturers' accompaniment

tracks, utilizing the words, names, symbols, and other devices associated with those manufacturers, upon information and belief without authorization.

77.  Defendants DUFFY'S IRISH PUB and BCK CORPORATION or their providers of karaoke entertainment services knew, or should have known under the circumstances, that they were obtaining and using counterfeit karaoke tracks.

78.  Upon information and belief, defendant DUFFY'S IRISH PUB, through an employee or contractor, operates a karaoke system to produce karaoke shows at its Lebanon, Oregon location in which counterfeit goods bearing the Sound Choice marks are being used.

79.  Defendant DUFFY'S IRISH PUB was observed on at least one occasion within the past year repeatedly displaying the Sound Choice marks without right or license.

80.  Defendant DUFFY'S IRISH PUB has advertised or otherwise indicated that it is in possession of a library containing approximately 9,000 tracks stored on its karaoke system.

81.  Based upon the popularity of Slep-Tone's music, the size of defendants' library, the Sound Choice branded songs known to be used by defendants and the number of systems used, the plaintiff has a good-faith belief that discovery will show that DUFFY'S IRISH PUB and BCK CORPORATION:

   a.  are in possession of a large number of unauthorized counterfeit goods bearing the Sound Choice marks; and/or

   b.  knowingly benefit from and has the capacity to control the infringing conduct of others.

82.  DUFFY'S IRISH PUB and BCK CORPORATION are accused of committing acts of infringement, unfair competition, and deceptive and unfair trade practices in substantially the same way, namely, through the use of counterfeit karaoke tracks to provide karaoke entertainment services.

COMPLAINT                                                                                          15

83.    DUFFY'S IRISH PUB and BCK CORPORATION'S physical ability to play unauthorized counterfeits of Slep-Tone's karaoke tracks is predicated upon access, either directly or through one or more intermediaries, to Slep-Tone's original karaoke recordings.

84.    But for their direct or indirect access to those original recordings, DUFFY'S IRISH PUB and BCK CORPORATION would not have been able to commit acts of infringement in the manner in which they have so done.

85.    Though created through unauthorized duplication, the counterfeit karaoke tracks obtained, made, used, or trafficked by DUFFY'S IRISH PUB and BCK CORPORATION all originated, directly or indirectly in an unbroken sequence, from the same ultimate source, namely, from compact discs sold by the plaintiff and made from master recordings belonging to the plaintiff.

## DAMAGES

86.    The defendants' unauthorized use of the Sound Choice marks has damaged the plaintiff.

87.    Defendants have damaged the plaintiff in an amount of at least $10,000 for each karaoke system the defendants operate.

## FIRST CLAIM FOR RELIEF

### TRADEMARK INFRINGEMENT

88.    Plaintiff re-alleges paragraphs 1 through 87.

89.    Defendants used, or authorized or directly benefited from the use of a reproduction, counterfeit, or copy of the Sound Choice marks in connection with the provision of services including karaoke entertainment services, by manufacturing or acquiring the reproduction,

COMPLAINT                                                                                    16

counterfeit, or copy of the Sound Choice marks and by using and displaying the reproduction, counterfeit, or copy of the Sound Choice marks during the provision of those services.

90.    The defendants' use of the Sound Choice marks was "in commerce" within the meaning of the Trademark Act of 1946 as amended.

91.    Plaintiff did not license defendants to manufacture or acquire reproductions, counterfeits, or copies, or to use the Sound Choice marks in connection with the provision of their karaoke entertainment services.

92.    The defendants' use of the Sound Choice marks is likely to cause confusion, or to cause mistake, or to deceive the defendants' customers and patrons into believing that the defendants' services are being provided with the authorization of the plaintiff and that the defendants' music libraries contain *bona fides* legal and licensed Sound Choice accompaniment tracks.

93.    The acts of the defendants were willful.

94.    Unless enjoined by the court, the defendants' infringing activities as described above will continue unabated and will continue to cause harm to the plaintiff.


### SECOND CLAIM FOR RELIEF

### UNFAIR COMPETITION – 15 U.S.C. § 1125(A)

95.    Plaintiff re-alleges paragraphs 1 through 87.

96.    On multiple occasions when defendants caused a Slep-Tone accompaniment track to be played during a karaoke show, defendants displayed the Sound Choice marks in connection with the defendants' karaoke entertainment services.

97.    The display of the Sound Choice marks is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into

COMPLAINT                                                                                                17

believing, falsely, that Slep-Tone sponsored or approved the defendants' services and commercial activities.

98.    The display of the Sound Choice marks is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by Slep-Tone and legally purchased by the defendants.

99.    Defendants' use of the Sound Choice marks in this fashion would have inured to the benefit of the plaintiff if the defendants had legitimately acquired genuine Sound Choice discs instead of counterfeiting them or acquiring counterfeit copies, in that the plaintiff would have received revenue from such sales.

100.    Defendants' use of counterfeit Sound Choice marks has further impaired the ability of legitimate providers of karaoke entertainment services from providing and producing shows and impaired legitimate customers of plaintiff from being able to compete, profit and purchase plaintiff's products.

101.    Because Slep-Tone has been denied this revenue, it has been damaged by the defendants' illegal activity.

102.    Unless enjoined by the court, the defendants' unfair competitive activities as described above will continue unabated and will continue to cause harm to the plaintiff.


### THIRD CLAIM FOR RELIEF

### UNLAWFUL TRADE PRACTICES – ORS §§ 646.0608 AND 646.638

103.    Plaintiff re-alleges paragraphs 1 through 87 above.


COMPLAINT                                                                                    18

104.    Defendants have engaged in acts of infringement of the Sound Choice marks, in derogation of Slep-Tone's common-law and statutory rights in those marks.

105.    Defendants' acts of infringement occurred during the conduct of trade or commerce.

106.    Defendants' acts of infringement constitute unlawful trade practices within the meaning of ORS § 646.608(1), and specifically ORS § 646.608(1)(c) and (u).

107.    As a direct and proximate result of defendants' acts of infringement, Slep-Tone has suffered a pecuniary loss, to wit:  the loss of revenue associated with sales or distribution of compact discs to karaoke jockeys, commensurate with the demand for the contents of those discs, which revenue would have been received but for defendants' acts in creating or acquiring counterfeits of Slep-Tone's accompaniment tracks.  As such, Slep-Tone is an aggrieved person within the meaning of ORS § 646.608(1) (2011).


## FOURTH CLAIM FOR RELIEF

### COMMON LAW PASSING OFF

108.    Plaintiff re-alleges paragraphs 1 through 87 above.

109.    Plaintiff is the owner of notable goodwill associated with its karaoke products identified by specific insignia and marks.

110.     Defendants' use and display karaoke products which include plaintiff's insignia and marks specifically identified them as sourced from plaintiff when they are not in fact legitimately sourced from plaintiff.

111.    Defendants economically profited from the illegitimate and illegal use and display of karaoke products which included insignia and marks specifically identifying them as sourced from plaintiff.

COMPLAINT                                                                                          19

112.    Plaintiff and plaintiff's goodwill suffers damage due to defendants' illegitimate and illegal use and display of karaoke products which include insignia and marks specifically identifying them as sourced from plaintiff.

## FIFTH CLAIM FOR RELIEF

### ORS §§ 20.080 AND 20.082

113.    Plaintiff re-alleges paragraphs 1 through 112 above.

114.    More than thirty (30) days prior to filing the present complaint, plaintiff made a demand on defendants for monetary damages of $10,000.00.

115.    Defendants have failed or refused to pay plaintiff's demand.

116.    Pursuant to ORS §§ 20.080 and 20.082, plaintiff shall be awarded all costs and fees in this matter.

## NOTICE OF FURTHER CLAIMS

117.    While the relief prayed for by plaintiff is specific, plaintiff hereby provides notice of the potential damages available under various State and Federal Laws, such as 15 U.S.C. 1117 and 1118, which include:

    a.   Defendants' profits;

    b.   Plaintiff's full damages;

    c.   Statutory damages of not less than $1,000.00 per counterfeit mark and damages of up to $2,000,000.00 per counterfeit mark should there be a finding of willful conduct;

    d.   Treble damages;

    e.   Punitive damages;

COMPLAINT                                                                                           20

    f.   All costs of this action;

    g.   Pre-judgment interest;

    h.   Attorney fees;

    i.   Broad equitable relief, including the seizure or destruction of all infringing articles;

118.   Plaintiff provides further notice that plaintiff's trademark SOUND CHOICE has been registered with the State of Oregon, Reg. No. 42,675, and plaintiff has rights and recoveries available to it pursuant to ORS §§ 647.005, et seq.

119.   Plaintiff gives notice it may move to elect the full scope of relief available against defendants as discovery proceeds.


## **PRAYER FOR RELIEF**

Wherefore, plaintiff Slep-Tone prays for a judgment against the defendants and that the court:

    A.  Find the defendants have committed acts of infringement, including, but not limited to counterfeiting of the federally registered Sound Choice marks;

    B.  Find the defendants have engaged in unfair competition against plaintiff Slep-Tone in violation of 15 U.S.C. § 1125(a);

    C.  Find the defendants have committed unlawful trade practices under Oregon Law;

    D.  Find that the defendants have committed the common law tort of passing off.

    E.  Find that the defendants' activities were in all respects conducted willfully and for profit;

    F.  Enter judgment against the defendants and in favor of plaintiff Slep-Tone in the amount of $10,000.00;

    G.  Award plaintiff Slep-Tone its costs of suit and attorney fees pursuant to ORS §§ 20.080 and 20.082; and other relevant statutes; and

COMPLAINT                                                                 21

H.  Grant plaintiff Slep-Tone such other and further relief as justice may require.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff Slep-Tone hereby demands a trial by jury.

DATED: April 1, 2013.

Respectfully submitted,

/s/Carl D. Crowell
Carl D. Crowell, OSB No. 982049
email:  crowell@kite.com
CROWELL LAW
P.O. Box 923
Salem, OR 97308
(503) 581-1240
Of attorneys for the plaintiff

COMPLAINT                                                                                22